UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT BURTON, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | 1:25-cv-00640-JAW |
| | ) | |
| NATHAN THAYER, | ) | |
| | ) | |
| Respondent | ) | |

## RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from state court convictions for murder and possession of a firearm after having been convicted of a crime punishable by more than one year in prison. (Petition, ECF No. 1.) Petitioner argues his attorneys provided ineffective assistance. The State asks the Court to dismiss the petition. (Response, ECF No. 4.)

After a review of the section 2254 petition, the State's request for dismissal, and the record, I recommend the Court grant the State's request and dismiss the petition.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On the morning of June 5, 2015, a woman was found lying in blood and non-responsive on the first floor of her home in Parkman, Maine. First responders confirmed the victim was dead and had bullet holes in her back. A backpack and jacket were found on the ground behind the house, and the victim's daughter identified the items as belonging to Petitioner, who previously had a romantic relationship with the victim. Police found a truck belonging to Petitioner in the woods near the victim's house, but they were unable to

find Petitioner until he turned himself in to authorities more than two months later, in August 2015.

Petitioner was charged in June 2015 with intentional and knowing murder in violation of 17-A M.R.S. § 201(1)(A); in October 2015, he was indicted on the same charge and for possessing a firearm after having been convicted of an offense punishable by more than a year in prison in violation of 15 M.R.S. § 393(1)(A-1). In late September 2017 and early October 2017, a jury trial was held on the murder charge. Petitioner chose to have the trial court adjudicate the firearm charge.

The State's witnesses at trial included the victim's daughter, two first responders, the victim's brother and neighbor, several coworkers and friends of the victim (some of whom also knew Petitioner), a nearby landowner, five police officers, the medical examiner, a jail medical provider, and two forensic analysts. Petitioner called as witnesses two police officers, a former romantic partner of Petitioner's, and Petitioner's parents. Petitioner also testified.

According to family and friends, the victim lived in the house with her daughter and son for many years, she began dating Petitioner in the spring of 2013, and Petitioner moved into the house in August 2013. The relationship had deteriorated by May 2015, and Petitioner told friends that he thought the victim was cheating on him. Petitioner admitted he took the memory card from an old phone belonging to Petitioner and copied the contents to investigate his suspicions. Petitioner and the victim had a confrontation on May 30, 2015, and she demanded that Petitioner move out of the house.

The victim changed the locks on the doors to her house. Others testified that she told them that she had broken up with Petitioner for good, that she was carrying a gun in her purse and sleeping with a gun under her pillow, and that she thought Petitioner was watching her place of work. A mutual friend testified that the victim said that she believed Petitioner was going to kill her. The victim began leaving work early so that her children would not be alone at the house after school. The victim's daughter testified that the victim told her not to go home with anyone else.

Petitioner's parents testified that he told them he would be camping alone because he needed time to think. A landowner testified that on June 4, 2015, he found Petitioner in the woods on his property and that it looked like he had been camping there for some time.

As part of the investigation of the victim's death, evidence technicians found bullets and casings on the floor of the bedroom in the victim's home. One bullet was lodged in the floor under the victim's torso, and another bullet was lodged in the ceiling above the bed. The medical examiner and a lab analyst testified that the victim's death was caused by three gunshots in the back, one of which was fired from three to eighteen inches away and two which were fired from more than eighteen inches away.

Pieces of duct tape were found on the victim's wrist and in her bed, and a knife was also found in her bed. Technicians found drops of blood matching Petitioner's DNA on a homemade gun cabinet and a fingerprint matching Petitioner on the outside of the window. The screws of the window lock had been removed and replaced with a piece of duct tape, allowing the window to be opened from the outside while it appeared from the inside as if it was locked.

Police testified that they found Petitioner's eyeglasses and prescription bottles in the backpack left behind the house. The backpack also contained a roll of duct tape, a pry bar, and handwritten notes accusing the victim of being involved with other men. Police found blood stains in the truck and on shirts inside the truck, which blood stains were later found to match Petitioner. There were strips of duct tape stuck to one of the shirts. A medical provider found that at the time Petitioner turned himself in to authorities, he had a mostly healed gunshot wound from a bullet that entered the left neck and shoulder area and exited his upper back and shoulder area.

The State argued at trial that Petitioner previously modified the window lock so that he would be able to enter the house, that on the night of the killing, he entered the victim's bedroom with strips of duct tape prepared on his shirt to restrain the victim (either intending to hurt her or to force a confession about his suspicions), that during his attempt, the victim shot and wounded him through her pillow as he leaned over her, and that Petitioner got hold of the gun and shot the victim three times after she attempted to get away.

Petitioner testified that he left the victim a note saying he would visit her on June 3, 2015, and appeared at the victim's house later that day. The victim opened the bedroom window to talk with him, and he then entered the home through the back door. Petitioner explained that after spending the night during which time he and the victim discussed Petitioner's suspicions, with the victim's agreement, he altered the window lock so he could nap in the house during the day. According to Petitioner, because he doubted the victim's statements from the night before, on June 4, 2015, he decided he return to the house and would use duct tape to restrain her to force her to talk truthfully. He said that

he later decided against that plan but forgot to remove the duct tape from his shirt. He stated that he entered the home through the bedroom window that night and talked with the victim.

Petitioner testified that the victim asked him about the duct tape and ripped a piece off while they discussed what he previously planned. Petitioner also testified that after further discussion, she fired a gun at him, put the gun under his chin, told him she was going to kill him, and attempted to pull the trigger, but the gun jammed or did not work properly. He asserted that he and the victim struggled over the gun, they both had their fingers on the trigger, the victim's foot slipped, her finger tensed on the trigger, the gun went off, they both fell, the gun ended up in his hand, his finger tensed as he fell, and the gun went off again. Petitioner claimed that he got up on a knee and put his hand on the victim, the victim squeezed his finger and said she was sorry, he stood and attempted to shoot himself, but the gun did not fire properly. Petitioner said that he cleared the shell, began to feel dizzy, fell to one knee, his finger tensed again, and the gun went off again. Petitioner maintained that he did not intentionally shoot the victim. Petitioner testified that he attempted to shoot himself again, but the gun was out of bullets.

The jury found Petitioner guilty on the murder charge, and the trial judge found Petitioner guilty on the firearm charge. In December 2017, the trial judge sentenced Petitioner to fifty-five years in prison for the murder conviction and four years in prison for the firearm conviction, to be served concurrently. Petitioner filed an appeal; in December 2018, the Law Court affirmed. *State v. Burton*, 2018 ME 162 ¶ 1, 198 A.3d 195.

In January 2019, Petitioner signed a state court postconviction petition, which the Superior Court received in February 2019. Counsel was appointed, and the petition was amended more than once. In July 2024, the Superior Court denied the state postconviction petition. Petitioner sought discretionary review of the postconviction decision; in March 2025, the Law Court denied the request for a certificate of probable cause to appeal from the decision. Petitioner subsequently filed this § 2254 petition.

## DISCUSSION

### A. Legal Standards

A person in custody pursuant to the judgment of a state court may apply to a federal district court for a writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal courts will not consider habeas claims on the merits, however, unless several threshold requirements are satisfied. For example, a state prisoner must raise all available claims in a single application rather than in successive petitions, 28 U.S.C. § 2244(b), the federal petition generally must be filed within the federal one-year statute of limitations, *id.* § 2244(d), and a petitioner ordinarily must exhaust all available state remedies by "fairly present[ing] [each] claim in each appropriate state court (including a state supreme court with powers of discretionary review)," *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quotation marks omitted).[1]

[1] To exhaust a postconviction claim fully in Maine, a petitioner must request discretionary review by the Law Court. *See* 15 M.R.S. § 2131. Because the Law Court's decisions are the final state court adjudications on the merits of each claim, the decisions ordinarily under review in federal district court are the Law Court's orders affirming the decisions of the trial court. However, if the Law Court's decision did not

In addition, a federal court ordinarily may not review a claim that was disposed of in state court "pursuant to an independent and adequate state procedural rule," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A procedurally defaulted claim can be considered only if: (1) failing to consider it would cause "a fundamental miscarriage of justice" due to new evidence of "actual innocence" showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *Schlup v. Delo*, 513 U.S. 298, 327 (1995); or (2) "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," *Coleman*, 501 U.S. at 750.

Ineffective assistance of counsel at trial or on appeal can establish cause to set aside a procedural default. *Id.* at 753–54. A petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Courts evaluate counsel's decisions from their perspective and knowledge at the time and apply a strong presumption that the attorney acted within the wide range of reasonable professional assistance. *Rivera v. Thompson*, 879 F.3d 7, 12 (1st Cir. 2018). A "reasonable probability" for purposes of establishing prejudice "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

---

explain the reasons for denying relief, the federal court presumes the Law Court adopted the trial court's reasoning unless the State rebuts the presumption. *See Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018).

Because the constitutional right to counsel does not extend beyond the direct appeal, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), ineffective assistance in a state postconviction proceeding generally cannot establish cause to set aside a procedural default. *Coleman*, 501 U.S. at 752–55. When a state effectively requires ineffective assistance claims to be raised in a collateral attack rather than a direct appeal, however, the lack of effective assistance during "initial-review collateral proceedings" (but not "other kinds of proceedings") will "establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," provided that the underlying ineffective assistance claim "is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14–16 (2012).

When reviewing a habeas claim adjudicated on the merits in state court, a federal court may not grant relief unless (1) the state court decision "was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1); or (2) the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented" in state court, *id.* § 2254(d)(2). A state court's legal conclusion is contrary to or an unreasonable application of federal law "only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson,* 569 U.S. 505, 508–09 (2013) (quotation marks omitted). A federal court's review of a claim adjudicated on the merits in state court is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (interpreting 28 U.S.C. § 2254(d)(1)).

When a federal court considers the merits of a claim that was not adjudicated on the merits in state court (i.e. a procedurally defaulted claim for which the default is excused), a federal court is only permitted to consider evidence beyond the state court record in narrow circumstances. If the petitioner "fail[s] to develop the factual basis of a claim in State court proceedings," the federal court can only consider facts beyond the state court record when the claim is based on a new retroactive rule of constitutional law or newly discovered evidence, and when the further factfinding would demonstrate "by clear and convincing evidence" that "no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2); *see also*, *Shinn v. Ramirez*, 596 U.S. 366, 381–82 (2022).[2]

**B. Ineffective Assistance Regarding a Prior Head Injury**

Petitioner argues that counsel provided ineffective assistance at trial and sentencing by failing to investigate and call an expert to examine him and testify about his prior head trauma. (Petition at 5.) Petitioner testified at the postconviction hearing that he attended therapy sessions in 2011 and 2012 and that he discussed with the therapist an ATV accident that occurred in 1993 or 1994 in which he suffered a spine injury and a neck injury and was diagnosed with a concussion. (November 20, 2023, Hearing Transcript at 8–9.) According to Petitioner, an investigation and expert would have allowed counsel to argue

[2] The Supreme Court holds petitioners responsible for failing to develop the record—and thus the stringent restrictions on evidentiary hearings apply—when the failure occurred because of a lack of effective assistance of postconviction counsel, even in circumstances addressed in *Martinez v. Ryan*, (i.e. when the failure occurred in an initial-review collateral proceeding and when the claim involves ineffective assistance of trial counsel). *Shinn*, 596 U.S. at 382.

that the injury affected his decision-making capabilities in 2015, would have supported a defense of adequate provocation, and could have served as a mitigating factor at sentencing.

Two medical experts testified and submitted reports as exhibits at the postconviction hearing. Petitioner's expert did not address the past head injury during his testimony at the hearing but opined in his expert report that it was unlikely that a traumatic brain injury in late adolescence was a major determinant in Petitioner's character formation.[3] The State's expert testified that he contacted the medical facility where Petitioner was treated after the ATV accident but the medical facility did not retain records from that time, and Petitioner's subsequent medical records and statements differed as to the seriousness of the head injury. (November 21, 2023, Hearing Transcript at 66.) As the following testimony reveals, the State's expert agreed that the ATV accident did not significantly impact Petitioner's culpability for the crime:

[3] The hearing transcript shows that the expert reports were entered into the state court record as exhibits. The copy of the state court record submitted to the federal court included transcripts of the state court hearings but not the exhibits. Here, the Court need not order the State to submit copies of the exhibits because there is no genuine dispute about the substance of Petitioner's expert's opinion regarding the 1993 head injury. The State's post-hearing memorandum quoted Petitioner's expert report and cited the corresponding exhibit, and the State's expert testified that he and Petitioner's expert agreed about the head injury. Petitioner has not disputed (in the state court proceedings or in his federal filings) the accuracy of the State's expert's characterization.

> Q: And do you agree with [Petitioner's medical expert] that any brain injury that he may have suffered as a result of an ATV accident, assuming it happened, didn't play a role in the incident that he was convicted of?
>
> A: I do agree with that.
>
> Q: If you could explain that to the Court?
>
> A: Yes. So again when we look at the sequelae or the results of a brain injury, first up, we need to know how bad the injury was, how severe it was, and there is a large body of literature on, for example, the result if someone has more of a mild brain injury or a more moderate or severe brain injury.
>
> Based on the information and what he explained to me, it sounds to me more like what we would describe as a concussion or a mild traumatic brain injury. Those types of injuries are not known to have long term behavioral or cognitive memory . . . sequelae. He went on then to go through the rest of his education, to being employed, to perform independently in a wide range of areas over time . . . including getting a commercial driver's license.
>
> So it did not appear to me that there were clearly functional impairments that could be attributed to any experience of a brain injury.

(*Id.* at 67.)

Although Petitioner asserted that he told officers about the prior therapy and thus gave counsel reason to investigate his mental health condition, Petitioner failed to establish deficient performance because it is unclear from the record whether Petitioner's attorneys knew about the head injury or had any reason to suspect it might be significant enough to matter at the time of the crime, more than twenty years after the ATV accident. Petitioner did not argue that he was incompetent or dispute counsel's determination that it was not feasible to pursue an insanity defense.

Even assuming Petitioner's attorneys had reason to investigate the prior head trauma, if they had investigated and obtained a neuro-psychological examination to explore the impact of the head trauma, there is no evidence that the investigation would have

yielded any information that would have made a difference at trial or at sentencing. Petitioner does not explain how the injury would have made an adequate provocation defense available, and such a defense would have been inconsistent with Petitioner's sworn testimony that all the shots were accidental and not intentional.

In sum, Petitioner has failed to establish that counsel acted unreasonably or that he was prejudiced by counsel's decisions. The state court's rejection of the claim, therefore, was not contrary to or an unreasonable application of *Strickland* or its progeny.[4]

## C. Other Claims

Petitioner raised six other ineffective assistance grounds in his federal petition, arguing that his attorneys should have: (1) retained a crime scene reenactment expert and proceeded differently during his testimony; (2) employed a forensic mobile phone expert to provide additional information regarding texts and browsing history among Petitioner, the victim, and others; (3) advised and prepared him better to testify in his own defense and at sentencing, and consult and inform him regarding the sidebar conferences at trial;

[4] Most of the experts' testimony addressed Petitioner's related state court postconviction claim that counsel failed to investigate and obtain an expert examination to address his mental health conditions (including PTSD, anxiety, and prior instances of suicidality) and other childhood circumstances (including sexual abuse he allegedly experienced). Petitioner did not raise those issues in his federal petition; he mentioned only the prior head injury. Even if the Court were to construe his first ground for relief as including the claims in the state court proceedings regarding his mental health and alleged childhood trauma, he would not be entitled to postconviction relief. The state court supportably credited the State's expert testimony, discounted most of Petitioner's expert's testimony, found that it was reasonable to avoid the mental health issues because much of the information could have worked against Petitioner at sentencing, and determined that there was no reasonable probability that the expert testimony would have altered the outcome at trial or at sentencing. (Postconviction Decision at 7–8.) Because Petitioner did not present any argument in this proceeding as to why the state court allegedly erred, and because no reason is apparent from a review of the record, Petitioner has failed to establish that the state court decision was contrary to or an unreasonable application of *Strickland* or its progeny.

(4) requested a jury instruction on adequate provocation to support a lesser manslaughter conviction; (5) consulted with Petitioner more during the appeal and raised additional issues on appeal; (6) objected at trial to a t-shirt allegedly worn by the victim's father, to a police officer sitting at the prosecution table, to the presence of armed officers at the back of the courtroom, and to allegedly excessive foot traffic in the courtroom.

Petitioner raised the other claims in his state postconviction petition in the Superior Court, but the State argues that he failed to exhaust the claims fully because he did not raise them in his petition to the Law Court for discretionary review. *See Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (exhaustion requires a petitioner to "fairly present" each claim to "a state supreme court with powers of discretionary review").

The State's argument has merit. Petitioner's brief before the Law Court addressed only the ineffective assistance claim involving the alleged childhood trauma and mental health issues. The only reference to any other claim is a single footnote stating that "Petitioner raised a number of other claims, which he also argued in a post-hearing Memorandum" and asserting that "[h]e does not waive those issues should this Court grant a full appeal." (Memorandum in Support of Probable Cause to Appeal at 3 n.2.) The purposes of the exhaustion doctrine would not be served if the Court were to countenance a bare attempt to preserve or assert, without any additional detail, an unspecified number of other claims, particularly where a movant does not explain whether the claims are based on state or federal law. Courts have repeatedly rejected arguments that the exhaustion requirement can be satisfied without presenting each claim to the highest court simply because the claim can be found within the lower court record. *See Josselyn v. Dennehy*,

475 F.3d 1, 3 (1st Cir. 2007) (summarizing cases holding that it would unfairly require high courts to comb through the entire lower court record if exhaustion was found when claims were asserted below but omitted from the petition for further discretionary review); *Mele v. Fitchburg District Court*, 850 F.2d 817, 823 (1st Cir. 1988) ("the argument cannot be right because it demeans the exhaustion principle; indeed it undercuts the entire rationale for requiring exhaustion"). For each of the other claims, therefore, Petitioner failed to exhaust fully the state court remedies.

When one or more claims in a federal habeas petition are unexhausted, a federal court ordinarily must allow the petitioner to decide whether to dismiss the entire petition or voluntarily dismiss all unexhausted claims and proceed only with the exhausted claims, or (in limited circumstances) stay the federal proceedings until the petitioner exhausts all claims. *Rhines v. Weber*, 544 U.S. 269, 277 (2005); *Rose v. Lundy*, 455 U.S. 509, 510 (1982). However, because Maine law prohibits successive postconviction petitions and imposes a statute of limitations for postconviction petitions, *see* 15 M.R.S. §§ 2128(3), 2128-B, and because Petitioner has not argued or shown that a recognized exception applies in his case, there does not appear to be any further available court relief, which means the other federal habeas claims are deemed to be exhausted but procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

Petitioner has also not established that there are any applicable exceptions to the procedural default rule. He has not argued (and the record does not show) that there is any new evidence of actual innocence. He has not argued that there is cause and prejudice to overcome the default, such as when a claim is omitted in a prior proceeding due to the lack

of constitutionally effective assistance of counsel. Because the claims were omitted at the discretionary review stage, at which time Petitioner had no right to the assistance of counsel, the lack of effective counsel cannot establish cause for the default. *Coleman*, 501 U.S. at 752–55. Furthermore, Petitioner cannot rely on the exception recognized in *Martinez v. Ryan*, because it only applies to claims omitted from "initial-review collateral proceedings" (where Petitioner asserted the claims here) and does not apply to claims omitted from "other kinds of proceedings" (like discretionary review proceedings, where Petitioner omitted the claims here). 566 U.S. at 14–16.

In sum, Petitioner is not entitled to relief on the other claims in his § 2254 petition.[5]

## CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases. I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## NOTICE

> A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered

[5] Even if there were some doubt about the application of the exhaustion doctrine, the procedural default doctrine, or the exceptions to a procedural default, the result would be the same because Petitioner would not be entitled to relief on the merits of his other habeas claims. The Superior Court rejected the claims, Petitioner has not presented any arguments as to why he contends the decisions were erroneous, and a review of the record does not establish that any of the state court's decisions was contrary to or an unreasonable application of federal law as determined by the Supreme Court.

pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of October, 2026.